Arianna M. v. Humana Health, Case No. 18-20700. Ms. Hopkins. Good morning, and may it please the Court. My name is Elizabeth Hopkins, and I'm here on behalf of the Plaintiff Appellant, Arianna M., in this case. I've reserved five minutes of my time for rebuttal with the Court's indulgence. This case is about the denial of benefits under an ERISA health care plan for something called partial hospitalization treatment for my client's severe eating disorder and related major depressive disorder when she was 19 years old. As I'm sure you know, this is not the first time this case was before the Court. I wasn't here on the last occasion. But last year, the en banc Fifth Circuit overruled its longstanding precedent in Pierre and held that de novo review is applicable to both the legal and factual determinations by a plan administrator. But despite this favorable ruling remanding the case to the district court and mandating application of a more stringent standard of review, the district court made two rulings that are relevant to this appeal. First, the district court again upheld the denial of benefits, doing essentially the same analysis it did on the abuse of discretion review. And second, the court concluded that despite her groundbreaking victory in the prior appeal in this case, Arianna had not achieved the modicum of success necessary to constitute. Do you agree that you're limited to the administrative record? Yes. I'm going to concede that point. Yeah. How is it that that administrative record is missing so much of the medical records? Well, Your Honor, Arianna was not represented when she was sick and in treatment. And, you know, it's hard to know exactly what happened, but it appears that Humana and Humana's reviewing doctors never requested or reviewed that medical record. What they did do apparently was talk to a couple of her treating providers and, you know, took notes of those conversations, which did support, you know, many of the things that I've said, everything I've said in the briefing. If it had been for counsel at the time, then you would have gotten it in the record by you would have requested it and sent it in, or I just feel like there's something missing here, and I'm just trying to understand that. Yes. We certainly would have sent in the whole record. Now, of course, it's a moving target when somebody's in treatment for a while, but we certainly would have submitted the record up to the time, you know, that we were making appealing the denial of benefits. And, you know, our practice at our firm is also to then again submit records at the end of the treatment process and make what's sort of a post-treatment claim for benefits and renew it again. But, you know, as I say, we weren't involved at that point. That didn't happen here, so we're stuck with the records we have now. Yes. Where in those records is there not evidence to support what the district court did? Well. Evidence to support what the district court did, so what's left for us to consider? I would disagree that the evidence that is there, really what we have, as I said, is the two reviewing doctors' notes of their conversations with Ariana's treating physicians, and those note her history of, you know, over-exercise. They note that she was covered with self-inflicted cuts when she entered treatment in April. They noted that, you know, her doctors, that she still had urges to restrict her food intake, to over-exercise, to harm herself by cutting herself at the time of the denial. All of this is noted in the reviewing doctors' own notes, and then they come to these conclusions that really don't seem at all supported by what her treating doctors were saying about both her precipitating symptoms, her condition at the time of the denial of benefits, and what they considered, you know, based on their own, that the treating doctors had the full medical record, the reviewing doctors did not, and based on that they made a prediction about what would happen almost immediately if she left treatment, which is that she would over-exercise. She'd deteriorate very rapidly. She'd over-exercise. You know, she was saying this, that she would harm herself. You know, she'd start cutting herself again. And, you know, based on all of this, her treating physicians very clearly said, and this is stated in the record, the limited record that we have, that they believed, and I think it's clear that they believed that she needed to continue treatment. And the conclusions to the contrary by the reviewing doctors really have no support, even in this very limited record. And that is our point. It's not ñ What about the evidence that she had stabilized by the time they stopped approving the benefits, that her weight had stabilized, that she was basically not over-exercising, her parents had been given some therapy so that they could be more helpful during the intensive outpatient treatment, which was what Humana was proposing to approve? I mean, isn't that some evidence to support the determination? Well, turning first to the weight, the type of eating disorder she had and her depression were not associated with being underweight. And, in fact, when Arianna was admitted for treatment, she was over 130 pounds, which was considered, you know, above her ideal body weight. So this was not anorexia. There weren't these wild gaps in her weight. It was staying fairly steady. I'm not saying that's determinative, but it is a factor. Actually, her weight had gone up, and, you know, it was a little bit higher towards the end. But, again, weight really is not a symptom. Even under the criteria that Humana was applying, you know, which we don't think are really appropriate, but even assuming those are the right criteria, weight shouldn't be one of the factors, and that really didn't have to do with it. I mean, her eating disorder involved, you know, over-exercising. The kind of eating disorder she has has symptoms of both bulimia and anorexia. So, you know, there's sort of a variety of very destructive behaviors, but it's not like anorexia where it's really about weight. So that factor, I have to say, was irrelevant. I don't think... If you don't mind, let me ask a question. Let's talk about the attorney's fees. What are you looking for? What's the amount? I think the amount that we had asked for in the district court was around $140,000 in attorney's fees. Yeah, turning to that issue... Have there been any settlement negotiations over the attorney's fees? Other than coming back to the court, have you all tried to work this out? Limited, but we haven't made progress on that front. I mean, we have talked, and yes. You described your... What else are you looking for? Are you looking for a readmission? I'm just not sure where you are at this point in this client's life. No, we're looking to get the money that her family expended on her treatment for several months, which Humana didn't pay for. So, you know, it's... So what amount would that be? You know, I don't have the exact amount. It's over $100,000 for the... In addition to the $140,000. And it's a little bit debatable, too, because Humana usually pays a little bit less than the sort of off-the-rack price. So there's always some negotiations about the exact amount. But it's over $100,000, the amount that they're seeking. And we're seeking about $140,000 in attorney's fees if you don't overturn the denial of benefits. Obviously, if you overturn the denial of benefits, there are additional fees that we believe, you know, we'd be entitled to. But regardless of whether you overturn it, you know, under ERISA Section 502G, we believe we're entitled to attorney's fees because the successful en banc determination by this Court constitutes some success on the merits. Pierre, you had called it groundbreaking. And what was so groundbreaking about it in terms of how it ultimately benefited your client? Yes, I mean, it was groundbreaking in that it overturned a precedent that was decades old, Pierre. And, you know, we think it was obviously the correct decision and brought the Fifth Circuit in line with the other circuits on this issue of standard of review. How did that shake out to the benefit of your client in this case? Well, standard of review is often, not always obviously, but often outcome determinative. And it certainly favors one side or another. And a de novo standard of review is, you know, arbitrary and capricious review is highly sought by insurance companies and de novo is obviously highly sought by claimants. It benefited her in that we got a remand. You know, we were at the end of the road. We got a remand to the district court for a second look. We think the district court got it wrong and should have, particularly under a de novo standard of review, awarded reverse the denial of benefits and awarded benefits to Ariana. And, you know, that is enough to constitute some success under the Hart v. Reliance standard decision from the Supreme Court, which expressly rejected that you have to be a prevailing party and succeed on a claim for benefits in order to get attorney's fees. But there is deferential standard of review on the attorney's fee question. And so are you suggesting that although Judge Rosenthal stated the correct legal standard, she didn't apply it? You know, it would be deferential standard of review if he got past sort of the Hart analysis. But I would say that I don't think the prevailing party standard of review is really entitled to deferential review in that it's sort of a legal question, you know, more than a — Well, that, I mean, okay, so abuse of discretion does encompass that. When you make an error of law, then that's an abuse of discretion. On the other hand, if you say, well, weighing everything, I don't really find that you succeeded on the merits somewhat, that's more factual or maybe at least a mixed question. So I'm just saying that it's a deferential standard of review, and Judge Rosenthal announced the correct legal standard and then said you didn't have any success on the merits. So why wouldn't we just accept that? Well, because I think he was conflating. Are we talking about — you keep saying he. It's Judge Rosenthal. Oh, I'm sorry. Excuse me. I'm just confused. Yeah, no, no, no. I'm a director. I wasn't a judge. Yes, yes, it was. I'm very sorry. I'm new in the case. I apologize. Yes, but I think she was conflating success on the merits with — success on the merits with being a prevailing party. And I think that was fundamentally the problem, because — So you're saying she applied the wrong legal standard. Yes. Because I do think that that's correct. I mean, Hart, I would say, probably left it open. But, you know, we've looked at decisions from other circuits, and particularly the gross decision from the First Circuit, where the court, in remarkably factually similar circumstances, said that obtaining on appeal a decision from a circuit court reversing precedent on standard of review is some success on the merits, regardless of — and remanding back to the lower court and the administrator for further look at it is some success on the merits, regardless of whether benefits are ultimately obtained. And so we think that's exactly the same situation here. That court, the gross court, said that that increased the likelihood of getting a favorable determination. It was more than a minor procedural victory, like a victory on a discovery — in a discovery dispute or something like that. And it benefited every plan participant in that circuit. And the same could be said here, because this new ruling in Arianna M. is something that's going to apply to, you know, all plan participants and beneficiaries in the future in the Fifth Circuit. So applying that analysis — and we think that that analysis is consistent with the history of Section 502G, which was designed to ensure that people could have And, you know, given the fact that Congress rejected — very clearly rejected a prevailing party standard, which requires that you win on the merits, we think that, you know, there's got to be something short of a win on the merits. And an en banc decision from the Fifth Court — from the Fifth Circuit ought to be enough to constitute some success on the merits under this Hart standard. Even if it results in no relief to your client. Yes. I mean, that's exactly what the First Circuit said in the Gross case. And we think that that's right. I mean, honestly, I think we probably could have applied for attorney's fees at that point, you know, when the decision came out. I see my time is up, and with the Court's indulgence — or permission, I'll reserve the rest of my time for rebuttal. Thank you. All right. Mr. Saltero? Good morning. May it please the Court, Counsel. My name is Carlos Saltero. I represent Humana in this case. After 49 days of partial hospitalization that had been approved, after going through several processes that had initially been denied, and then using the Mihalik criteria reversed and provided for that treatment, the determination of the court's decision was made that partial hospitalization, that level of treatment, was no longer warranted under the plan. Humana has prevailed in this case, both at summary judgment on an abuse of discretion standard and a de novo standard. Initially, back in 2015, we had moved for summary judgment under the then-existing Pierre standard, but also asked the court, in the alternative, to rule that if it's correct that it's de novo, that summary judgment was warranted on the record. I would note that in the dissent from the en banc opinion, Judges Elrod, Jolly, and Clement noted in dissent that the record showed no genuine issue of material fact, and it was a waste of judicial resources to further remand the case. We would agree, and we're here asking the court to end this litigation. That's taken way too long. On remand, nothing new happened, and there was nothing additional that changed. What we're looking at, really, is a snapshot in time as of June of 2013. What has driven this case, and I think we heard a lot about it in the first, during counsel's argument, and it's noteworthy that in their brief, they say they want oral argument because of the attorney's fees issue. This, unfortunately, has been an attorney-driven litigation. Fees has been the driving force why we couldn't resolve the case. Well, now we can see why they needed an attorney sooner, because how on earth could you all be making decisions on the medical propriety of her treatment without reviewing the medical records? I just find this appalling. That may be that's what our precedent allows you all to get away with, but how can you possibly do that and find that to be a reasonable approach? Your Honor, if you note the Dr. Prabhu's review, he was talking to the provider and had very detailed notes. So I'm not sure whether he had the actual medical records at that time, but everything in those medical records for that time was included. Her prior history was included in that analysis. We can't have barred them from even talking about the medical records because they're not in the administrative record. And I understand that's our conclusion, and that ordinarily makes sense because we don't want to bring in a bunch of experts to redo everything and whatever. But the actual on-point, day-to-day records that are being kept during the treatment in question absolutely should be part of the administrative record. And if they're not because you all, having the superior knowledge and wisdom, are able to trick someone into not getting that in the record, how can you possibly be accusing them of having too much attorneys? They had too little attorney. Well, Your Honor, I think if there had been a remand to the administrator or a request to supplement the records as to any relevant time period, we may be dealing with something totally different. But what happened in this case is that they dumped all the medical records after the fact, their stuff from before the relevant date in question. And so it doesn't really go to the issue in the case, which is a snapshot in time. What they want to do is try to use those records from subsequent, the rest of the time she spent at the facility in Utah, and suggest that it was an error to have made the decision when it was made based on what the doctors were telling the evaluators and the administrators at the time. And then I think that ERISA certainly provides the opportunity for a participant or a provider to supplement the administrative record in any way they would like to at the time. There's also an appellate process that they did go through, and nothing was supplemented at the time. Obviously, ERISA is a little bit different than a standard commercial plan. And part of the idea is that it's more, it would be a more efficient plan, and that's kind of one of the trade-offs. It's around all these insurance code requirements, which this would clearly violate, in my view. But, I mean, it is what it is. Law is the law. I respect that. I took an oath to follow that. And Congress has decided that this was a good system. And so that's the one that's been in place. And many people do have ERISA plans for whatever it is, health, disability, life. I heard counsel say that she thinks that the amount at stake was $100,000. I'm not aware of where that is in the record. I don't think that's in the record anywhere. That's certainly the first time I became aware that's what they were suggesting. Under the plan, what they would be ---- Benefits? I'm sorry, Your Honor? She suggested it was due for the benefits? Correct. Our calculation or estimate was that this was more of a $25,000 to $30,000 estimate. But what we haven't seen is actual proof of what arrangements there are between the facility and the lawyers and Ms. Ariana M's family as to what was actually paid or not paid and whether there's any discounts or agreements, et cetera. But under the plan, we're looking at a ---- it was a very small amount originally in dispute. The attorney's fees requested were large, and here we are, because we don't think we should be held up to pay a claim that's not warranted based on the potential that we might be liable for ---- Yes, Your Honor? Did Humana pay what the intensive outpatient would have been, or they paid nothing? There was no intensive outpatient, so my understanding is that Humana did not pay but would have paid had she availed herself of that treatment at her home in the Houston area. So why wouldn't they pay that? Because she did get treatment. So, like, in other words, instead of getting Class A treatment, they thought she should get Class B treatment, but they were not even paying for the Class B when she got the Class A? There's ---- my sense is because it was submitted and because of the process of how claims work, it was probably submitted by the facility in Utah, and it didn't qualify for medical necessity under the plan, and so it wasn't paid. I don't know that there was ever a request that, well, just pay us whatever the intensive outpatient ---- Because, I mean, that's typically what happened. I got some filling in my teeth that the insurance company thought was too high end, so they paid for the low end what the low end filling would have cost. I mean, why wouldn't you do that? I don't know that that was ever offered to Humana, and I don't know that that ---- I don't know why exactly. I can't tell Your Honor with precision why that happened other than what has been submitted and what has been requested was full payment from the or through the facility in Utah, the partial hospitalization treatment, not the lesser amount that would likely have been approved. It was in the denial letter that you may qualify for intensive outpatient. So you have no documentation of what the real out-of-pocket expense was? No, Your Honor, and we ---- Arianna M., as far as we're concerned, is almost a stranger to this litigation in the sense that there's been nothing very much submitted, you know, directly with her other than obviously the records and the request for payment, but it seems to be ---- That's a strange request for payment if you don't know what it is, how much it is. I mean, typically, I don't know. Yeah, it's been 11 years since I practiced as a lawyer, but when I would send or receive demand letters, they were for an amount. And typically, I would suspect that to be supported by some documentation, and that would be part of the record. I'm not aware of it being part of the record. And certainly, as I mentioned, no lining up or attempt to correlate to what the intensive outpatient or any other calculation. All right. Let's turn to the some success. Why isn't it some success to have gotten, first of all, to get on bonk in the first place, because we have about seven or eight of them a year out of thousands of cases, and then to win it? Well, Judge, I think the key there is to kind of step back and say, what is the standard? And it's not just some success. It's some degree of success on the merits. And I think the word on the merits has to mean something, and it can't just mean a procedural, like the Court said in Hart, a purely procedural or tactical victory. This in no way benefited Ariana M. It may have altered the standard of what's done in the future in certain cases, because there are still cases that are reviewed for abuse of discretion if they're not in, you know, depending on what the plan provides for and if there's not a discretionary clause ban, for instance. So there was some change in the law, but it's not a degree of success on the merits. I think if you — on attorney's fees — I mean, how — okay. Obviously, I think everybody agrees that some degree of success on the merits is something less than prevailing party. How could you possibly square that, then, if you have to win something, then you're a prevailing party? And so how can we have a lesser-than-prevailing party and still have to be a prevailing party?  No, Your Honor. Hart's been very clear. It's not prevailing party. It's sort of a little bit like the declaratory judgment action in Texas practice under Chapter 37 in the sense that there's no — no requirement that any fees be awarded to any party, first of all. That's what the plain language said, and Hart supports that. Then it's — this Court would review a district court's award for abuse of discretion, and our position, obviously, is that Judge Roosevelt did not abuse our discretion in not awarding any fees. Certainly, Humana prevailed in this case at every step on the merits. We could have sought our attorneys' fees but chose not to. We certainly don't want to come after a person who — a young lady with her challenges and stuff for attorneys' fees in a case like this. And so some degree of success on the merits doesn't just mean a procedural victory or, like, a reversal of an interlocutory appeal or something along those lines. It has to be merits. What's different than, for instance, Gross, in Gross it was remanded to the plan administrator, and the First Circuit actually said fees should be awarded to the claimant. The Fifth Circuit en banc was an 8-6 decision, and the panel was very clear that it made no judgment whatsoever on how the review would be applied down below, and so it didn't get into the merits of Arianna M's claim at all. Also, I would note that in the original Hart case, I think this is interesting to go back. First, we start with statutory construction. It's purely discretionary. Then Hart is clearly the law, and the Fourth Circuit and some other circuits had gone too far. I think it was the First. They had gone too far in requiring prevailing party. So they scaled it back in Hart. But that didn't mean everything then entitled somebody with modicum of success to obtain attorney's fees. And what's telling in Hart is that the district judge said if you don't award benefits to the plaintiff, to the claimant, then I will enter a judgment against you. So while there was no prevailing party at the district court level, it was clear that the court had weighed in on the merits and advised the plan administrator to reverse the ruling. So that plaintiff had certainly gone much farther in obtaining substantial success on the merits than what we have in this fact pattern. I'd also note, I was surprised to hear some discussion about that. There's a case that I just recently learned of. Apparently, it was about two weeks ago from the Eleventh Circuit where counsel for the claimant in this case also did not prevail on the merits. And the Eleventh Circuit said that flipping the standard of review did not justify meeting one of the five factors that would apply if fees were to be awarded. Next. The next question or caption or anything. Yes, Your Honor. It's a July 15, 2019, opinion. It's Alexandra H. v. Oxford Health Insurance, Inc., and it's number 18-14. 846 from the Eleventh Circuit. And you're saying their counsel, these lawyers are counsel in that case, so they know about it? Yes, Your Honor. That's exactly what I'm saying. Because I don't like when lawyers just bring something up in oral argument the other side doesn't know about, but if they're the lawyers in the case, I guess they know about it. Getting ready for argument, we found it and we thought about citing it, but it didn't seem relevant to any issue because, again. Why are you discussing it now? Well, because the issues have been raised now about attorney's fees. We thought that the issue would just end at whether they were entitled to any attorney's fees or not. This goes more into the Robinson factors and into the ---- How much? Right. Well, we're certainly not going to decide that. If we were to reverse on attorney's fees, it would debt. Well, I speak only for myself. I would remand if I reverse on attorney's fees. But obviously, I'm only one of three. But I think that's the general practice. And, Your Honor, if I may conclude and yield the rest of my time, I would say a couple of things on policy, unless there's any other questions from the panel. From a policy standpoint, we ---- it's not a good idea to ---- certainly part of the statutory construction and good policy for people to be able to afford attorneys and for there to be fee-shifting arrangements to allow people to be represented. But that doesn't mean that you turn things on their head and kind of create a system that incentivizes these claims generated just to try to seek attorney's fees. This Court in the Davis case that we cited has written about that recently. There are other cases where the Court has noted that that's a problem, and it's not the possibility that somebody might be able to get attorney's fees does not turn something into a blank check or slot machine or a license to churn. We're ---- we believe that the ---- this case should have been over in February of 2016 when Judge Rosenthal wrote her first very detailed, very well-reasoned summary judgment opinion. We're not trying to impose any further burdens on this young lady. We just want this litigation to end. And so Humana would respectfully request that the Court affirm Judge Rosenthal's opinion in this case. Thank you. All right. Ms. Hopkins, you save time for rebuttal. Yes. I just have a few points. First of all, I think that it is correct that there's nothing in the record that shows the exact amount that's due. There have been some discussions, and there's a disagreement about that. So, you know, I'm not saying it's ---- it would necessarily be the amount that we're asking for. Did you make the case for, well, you should have at least paid the amount that an outpatient, intensive outpatient treatment would have cost, since you agree that that's appropriate? You, Humana, agree that's appropriate? Did you all ever make that? I don't believe we made that argument, but we have been fought on those kinds of arguments before. And I think even here, even though Avalon Hills provided that kind of intensive outpatient treatment, I think what I'm hearing Humana say, and I think what they've said previously in the case, was that, no, she wasn't ---- she couldn't get it there. You know, as it was, Arianna was getting partial hospitalization treatment, but she was actually boarding there, because this was a long way from her home, the treatment facilities in Logan, Utah, and she lives in Texas. And, you know, so her family was paying the additional amount for her to board there. And, you know, I don't believe that Humana is saying that they would have paid for intensive outpatient treatment at Avalon Hills. They wanted her to go back home. And they didn't even approve intensive outpatient. They suggested that that might be appropriate. That would have been another fight, I'm guessing. Just one point, one more point on the merits and the lack of the medical records in this case, which I, too, find appalling. ERISA is different than commercial plans. You know, ERISA plans are different than commercial insurance plans. But the Supreme Court said in MetLife v. Glenn that this means that there are higher-than-marketplace standards, because those that administer the plans and decide claims for benefits, exactly what they said in Glenn, are ERISA fiduciaries who owe ---- Would you ever seek to amend the administrative record before the ---- before Humana? In other words, go back to them and say, you all need to consider these medical records, either the post-talk, after the treatment, or at least the medical records that were extant at the time of your final ruling? Well, that was part of our battle for a couple of years about trying to get in these additional records. But that was in the district court. And, again, I think our law on that is clear, and I don't have any problem with our en banc decision on that. Right. But I guess what I'm saying is Humana fought us on that. Humana could have said, oh, yes, of course, we made a mistake here. You know, here, let us look at these records. It was clear that, you know, we wanted to get those records in and thought they were very relevant. And, you know, that was certainly not the approach that Humana took in this case. Turning to the ---- oh, and just one more point. But you all didn't appeal the denial of the motion to strike. I mean, the granting of the motion to strike. I'm sorry. I didn't. We didn't. It's not part of that appeal. And I'm not saying here, I'm not trying to rely on that evidence. I'm relying on, you know, what little was there, which I don't think at all supports what the reviewing doctor said and concluded. On the attorney's fees issue, it's true that in the Hart case, the court, not the lower courts, had weighed in on the merits there. And the Supreme Court said because, you know, the court essentially said if you don't grant the ---- if you don't decide this within 30 days, I'm going to grant the benefits. And so, you know, the Supreme Court said that was enough and that, you know, that was more than enough, more than some success on the merits in Hart. But in Gross, the courts did not get into the merits at all. The court of appeals, the First Circuit, simply said that the standard of review was wrong. It was sending it back for a new look under the correct standard of review, de novo standard of review, and said, you know, it doesn't matter, you know, that benefits haven't been awarded. That's a prevailing party standard. It's enough that we have reversed an old precedent, and that's enough of a success on the merits. On the standard of review, so it's really hard to see how Gross is distinguishable from this case. The Alexandra H. case, which my opposing counsel referred to, it's true that fees were denied there and we asked for them even though we didn't, you know, prevail on the merits. But, you know, I have to say it's not nearly as analogous as the Gross decision. I would say it's not analogous at all because there wasn't a court of appeals decision reversing on standard of review and sending it back for that. So thank you very much. I'm glad you answered that because he brought that case up out of nowhere, but. Oh, I'm sorry. Thank you so much. We appreciate both sides' arguments, and the case is now under submission.